IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| BRIAN BRANT, BROOKE FRITZ, ROBERT CALDWELL and MAYENSSI MONTIEL, Each Individually and on Behalf of All Others Similarly Situated;<br><br>Plaintiffs,<br><br>v.<br><br>PARKING REVENUE RECOVERY SERVICES, INC., a Colorado Corporation,<br><br>Defendant. | Case No.: Case No.: 1:25-cv-1771-NRN<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Brian Brant, Brooke Fritz, Robert Caldwell and Mayenssi Montiel (collectively "Plaintiffs") bring this Amended Class Action Complaint against Parking Revenue Recovery Services, Inc. ("PRRS" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters:

**INTRODUCTION**

1. PRRS presents itself as a cutting-edge parking-enforcement solution, advertising its "top tier read rate ALPR system and AI-based video analytics to deliver non-stop auto-matic [sic] high-efficiency monitoring of ARC-enabled parking lots, without gates or barriers."[1] However, in practice, its systems are engineered to confuse consumers and extract unauthorized

---

[1] *See* https://prrsparking.com/ (last visited June 3, 2025).

1

fees. PRRS deliberately creates a convoluted payment process that deceives drivers and forces them into paying exorbitant "Notice Fees" that are, in effect, illegal fines.

2. Operating across the United States,[2] PRRS partners with or owns private parking facilities and employs monitoring technology to track vehicles. Instead of conventional entry and exit gates where drivers would normally stop to pay, small signs bearing QR codes replace these barriers, shifting the burden onto consumers. This "drive in and drive out" model leaves many drivers unaware of the need to make a payment, thereby setting the stage for a subsequent notice demanding a "notice fee" that far exceeds the originally advertised parking fee. PRRS insists that these notices are merely contractual in nature, but their function and effect are indistinguishable from those of an unlawful fine.

3. The evidence of this predatory scheme is striking. In one case, a plaintiff faced a $70.00 charge on a parking fare of around $4.00 per hour—a surcharge that dwarfs the actual fee by 1,750%—for overstaying by four minutes, representing an astronomical increase over the nominal rate. Even more egregious is the case where an individual paid $12.00 for three hours of parking time, left before the three hours were up, and received a $82.00 charge anyway.

4. Furthermore, PRRS's notices include threats of towing, booting, and further legal actions if the "fee" is not promptly paid—actions that no private entity is legally authorized to enforce beyond its own property. In addition to these deceptive billing practices, PRRS unlawfully collects consumers' personal information, including names, addresses, and vehicle data, to facilitate these fraudulent collections. Collectively, these practices violate multiple federal and state laws—such as the Driver Privacy Protection Act (DPPA), the Colorado Consumer Protection

---

[2] *See* https://prrsparking.com/company.html (claiming "800 parking locations . . . throughout North America) (last visited June 3, 2025).

Act (CCPA), and the Arkansas Deceptive Trade Practices Act (ADTPA) —rendering PRRS's operations illegal.

## PARTIES

5. Plaintiff Brant is a Citizen of Arvada, Colorado, and intends to remain there throughout this litigation. He parked at a PRRS managed parking garage in Denver, Colorado on May 28, 2025, and was issued a Notice of Non-Compliance on June 1, 2025.[3]

6. Plaintiff Fritz is a Citizen of Boulder, Colorado, and intends to remain there throughout this litigation. She parked at two separate PRRS managed parking garages in Denver, Colorado on February 16, 2023, and on May 14, 2025, and was issued a Notice of Non-Compliance in February of 2023,[4] and on May 17, 2025.[5]

7. Plaintiff Robert Caldwell is a citizen of Colorado, and intends to remain there throughout this litigation. He parked at a PRRS managed parking garage in Denver on May 21, 2025, and was issued a Notice of Non-Compliance thereafter and received the attorney letter attached hereto as Exhibit 4 prior to filing this claim.[6]

8. Plaintiff Montiel is a Citizen of Little Rock, Arkansas, and intends to remain there throughout this litigation. She parked at a PRRS managed parking garage in Little Rock on April 27, 2025, and was issued a Notice of Non-Compliance on May 1, 2025.[7]

9. PRRS is a Colorado corporation with its principal place of business at 6025 South Quebec Street, Suite 350, Greenwood Village, Colorado 80111. PRRS's registered agent for service in Colorado is InCorp Services, Inc., 36 South 18th Avenue, Suite D, Brighton, Colorado 80601. PRRS includes any presently unknown predecessors, successors, subsidiaries, affiliates,

---

[3] *See* Ex. 1.
[4] *See* Ex. 2.
[5] *See* Ex. 3. Plaintiff Fritz's Notice was addressed to her husband.
[6] *See* Ex. 4.
[7] *See* Ex. 5.

3

and all those benefiting from the balance collection scheme, which may be legally liable whether by merger, assignment, or otherwise.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is unknown but presumed to include Defendant's thousands of customers, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

11. This Court has subject matter jurisdiction over Plaintiffs' FDTPA and DPPA claims under 28 U.S.C. § 1331, 15 U.S.C. § 1692k(d), and 18 U.S.C. § 2721. This Court may exercise supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

12. This Court has specific personal jurisdiction over Defendant because it operates in this District, has its principal place of business in this District, has purposefully availed itself of the benefits and protections of Colorado by continuously and systematically conducting substantial business in this judicial district, directing advertising and marketing materials to districts within Colorado, and intentionally and purposefully seeking to collect "notice fees" throughout the United States with the expectation and intent that consumers would pay them, and it has illegally collected and profited from these collections practices.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(l) because Defendant maintains its principal place of business in the District of Colorado and is therefore "at home" in this District.

## FACTUAL ALLEGATIONS

**A.  PRRS's system is designed to generate Notice Fees**

14. At parking lots owned or operated by PRRS, individuals may park their cars in a

4

particular spot, for a particular amount of time, in exchange for a pre-set fee.

15. In Plaintiff Brant's case, the "posted" parking rate (obtained via QR code) at the PRRS managed parking facility located at 1401 Market Street in Denver, Colorado ("Market Street Garage"), was around $6.00 per hour on May 28, 2025. Plaintiff Fritz received a fine for a parking violation at the Market Street Garage on February 16, 2023; the "posted" rate at the Market Street Garage was around $4.00 per hour at the time. Plaintiff Fritz received a second Notice from PRRS for a parking violation at the PRRS managed garage located at 1385 Larimer Street ("Larimer Street Garage") on May 14, 2025. On information and belief, the parking rate at the Larimer Street Garage in May of 2025 was between $4 and $8 per hour. In Plaintiff Montiel's case, the "posted" parking rate at the PRRS garage located at 400 East 3rd Street in Little Rock, Arkansas ("East 3rd Street Garage"), was $4.00 per hour for her stay lasting approximately four hours on April 27, 2025.

16. On information and belief, most PRRS facilities, like the East 3rd Street Garage in Arkansas and the Market Street and Larimer Street Garages in Colorado are unattended for long periods of time. There are no entry or exit gates at these garages, and any individuals wanting to park at PRRS garages can only pay for parking by scanning a QR code that is placed on inconspicuous signs sparingly posted within the garage.

17. There are either no rates posted at the PRRS-operated garages (only a QR code) or there are only hourly parking rates posted. However, in neither case is the fact that a fine will be levied for violation disclosed on either the posted signs or through the QR code. On information and belief, the removal of gates and the use of inconspicuous signs requiring payment through a QR code and the nondisclosure of the fines is an intentional business strategy used by PRRS to manufacture and encourage an individual's non-compliance—so PRRS can later coerce "notice fee" fines from an individual and generate higher returns for itself.

5

18. PRRS removes the standard garage barriers to entry (gates that would require a ticket and payment upon departure) and installs its video monitoring system which instead tracks and documents a vehicle's license plate. As shown in the attached Notice, PRRS's system takes a picture of an individual's vehicle, with a time stamp for entry and exit in calculating the unpaid fare and "notice fee" fine.[8]

19. PRRS's drive-in and drive-out payment experience is designed to extract higher payments from customers, resulting in higher returns for PRRS and parking lot facility owners. A simple hypothetical example is shown in the following table. The table calculates the estimated revenue for a garage that has 3,000 daily visitors under two scenarios: a scenario with a normal entry gate system that requires 100% compliance, and the second scenario using PPM's barrier-less system, assuming a 20% nonpayment rate and a 90% "fee" fine collection rate. Under this basic example, **PRRS's system generates 164% of the revenue from a traditional gate system, driven by "balance" fines**.

|  | Traditional Entry Gate System | PPM Automated System |
|---|---|---|
| Cars Per Day | 3,000 | 3,000 |
| Paying Customers | 3,000 | 2,400 |
| Non-Paying Customers (20%) | 0 | 600 |
| Revenue for $15 Parking Charge | $45,000 | $36,000 |
| Number of Customers Subject to Violation Fine of $70 | 0 | 600 |
| Number of Customers who Pay Violation Fine (90%) | 0 | 540 |
| Violation Fine Revenue | 0 | $37,800 |
| **Total Revenue** | **$45,000** | **$73,800** |

20. On information and belief, the non-barriered QR-code system is a design that PRRS

---

[8] *See* Exs. 1–5.

6

knows causes individuals to not pay for parking. The design of this system is intentional and was created for a specific goal: extracting unlawful "notice fee" fines.

21. PRRS's system intentionally encourages minor technical nonpayment or underpayments of garage parking fees such that a large arbitrary and unauthorized "outstanding balance" fine can be threatened and collected from a significant portion of its customers. However, even in the instance where a customer intentionally does not pay a posted parking rate, that customer is still not liable to PRRS for any arbitrary "outstanding balance" fine it chooses to levy in addition to a legitimate posted parking fee.

**B.    PRRS's collection of the "notice fee" fine intimidates consumers into paying inflated amounts.**

22. Without any lawful authority, PRRS sends individuals who fail to pay for parking a form "Notice of Non-Compliance" through the U.S. Mail.[9] The clear goal of the Notice is to inflate any amounts owed and intimidate consumers into paying these inflated amounts. In the attached examples, the Notices claim that Plaintiffs' vehicle has an "notice fee" due to either an "Expired Permit/Facility Registration"[10] or because the vehicle "Registered Late; After Grace Period."[11]

23. Plaintiff Brant scanned the QR code at the Market Street Garage and paid an initial parking fee of $12.99[12] for two hours of parking time, from 5:51 pm to 7:51 pm. Plaintiff Brant exited the Market Street Garage at 8:35 pm, without paying for any additional time; Plaintiff Brant overstayed his pre-payment by 44 minutes. Rather than charging the additional $6.00 that Plaintiff Brant would have paid for an extra hour on site at the time, PRRS's notice fined Plaintiff Brant

---

[9] *See* Exs. 1–5.
[10] Presumably, this means that the cars stayed longer than what was paid for; neither the East 3rd Street Garage nor the Market Street Garage require a permit or facility registration for vehicles other than an hourly payment for parking. The precise purported parking infraction is unclear based on the language of the Notice.
[11] Plaintiffs are at a complete loss as to what this language means.
[12] This is the total charge Plaintiff Brant paid and includes tax on the hourly rate.

$97.00, an increase of over 1,600%.

24. In February of 2023, Plaintiff Fritz scanned the QR code at the Market Street Garage and paid an initial parking fee of around $12.00 for three hours of parking. Plaintiff Fritz exited the Market Street Garage within three hours but received a PRRS-issued fine for $82.00. When Plaintiff Fritz disputed the fine, PRRS lowered the fine to $62.00, which Plaintiff Fritz paid. Even the reduced fine was an increase of over 500% of the initial parking fee. Plaintiff Fritz received a second fine from PRRS on May 17 for a parking violation at the Larimer Street Garage. Plaintiff paid between $4 and $8 an hour for parking on May 14 and received a fine of $55.00.

25. On May 21, 2025, Plaintiff Caldwell scanned the QR code at the Laz Parking lot and paid an initial parking fee of $15.55. Defendant alleges in its letter to Plaintiff Caldwell that his parking expired on May 21, 2025, at 6:26 pm and that he excited the lot 36 minutes later at 7:02 pm. Rather than charging Plaintiff Caldwell for an additional hour of time, which upon information and belief would have cost $8.00 or less, PRRS's Notice fined Plaintiff $55.00, an increase of over 587%.

26. Plaintiff Montiel scanned the QR code at the East 3rd Street Garage and paid an initial parking fee of $9.64[13] for two hours of parking time, from 8:01 pm to 12:01 am. When the two hours were almost up, Plaintiff Montiel paid $7.31 for an additional two hours, from 11:57 pm to 1:57 am. Plaintiff Montiel exited the garage at 2:01 am, overstaying her payment by 4 minutes. Rather than charging the additional $4.00 that Plaintiff Montiel would have paid for an extra hour on site at the time, PRRS's Notice fined Plaintiff $70.00, an increase of over 1,750%.

27. The "notice fee" collection scheme is unlawful because it allows PRRS to inflate any potential debt (unpaid parking) by orders of magnitude without any authority to do so, and

---

[13] This is the total charge Plaintiff Montiel paid and includes tax on the hourly rate.

8

tricks and intimidates individuals into paying the inflated "outstanding balance" fine by threatening further fines or legal action, which PRRS has no authority to undertake.

28.   None of the plaintiffs herein agreed to arbitrate their claims against PRRS or otherwise released PRRS for any liability, whether substantive or procedural, during the course of doing business with PRRS.

**C.   PRRS's collection practices are pervasive and affect a large class of consumers**

29.   On information and belief, PRRS issues these unlawful "outstanding balance" notices to any vehicle that exits a PRRS-managed parking facility that does not comply with the exact terms that are only available through QR code scan, and these fines are exorbitantly greater than the initial hourly rate.

30.   PRRS captures the license plate and vehicle information of every vehicle entering and exiting a PRRS-managed parking facility in order to enforce its illegal compliance scheme. PRRS captures this personal information from all individuals entering and exiting PRRS-managed parking facilities, regardless of whether those individuals have scanned the QR code provided at the parking facility.

31.   Accordingly, PRRS's illegal fine collection scheme has damaged individuals who entered or exited a PRRS-managed parking facility, regardless of whether those individuals actually used the facility, by unlawfully capturing vehicle information and issuing illegal fines.

## CLASS ALLEGATIONS

32.   Plaintiffs bring this action as a class action and as representatives of the Class and Subclass defined below. This action is brought and can be maintained under Federal Rule of Civil Procedure 23.

33.   All Plaintiffs bring this action on behalf of themselves and all other individuals who meet the following Class definition, and Plaintiffs Brant and Fritz bring this action on behalf of

9

themselves and all other individuals who meet the following Subclass definition (collectively referred to as "the Classes"):

> **Federal Claims Class ("Federal Class"):** All persons or entities, being citizens of the United States, who have received a Notice of Non-Compliance from PRRS and paid any "notice fee" fine to PRRS.
>
> **Colorado Claims Subclass ("Colorado Subclass"):** All persons or entities, being citizens of Colorado, who have received a Notice of Non-Compliance from PRRS and paid any "notice fee" fine to PRRS.

34. Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; all federal, state, or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

35. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

36. <u>Numerosity,</u> Fed R. Civ. P. 23(a)(l): Members of the Federal Class and Colorado Subclass are so numerous and spread out that joinder of all members is impracticable. Upon information and belief, there exceed 10,000 individuals who have received a Notice of Non-Compliance and/or paid a "notice fee" fine to PRRS, and the Classes are apparently identifiable within Defendant's records.

37. <u>Commonality,</u> Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Federal Class exist and predominate over any questions affecting only individual Class Members. These include:

   a. Whether PRRS knowingly obtained, disclosed or used personal information from

10

    motor vehicle records of members of the Class for a purpose permitted under the DPPA;

    b. Whether PRRS violated the DPPA by disclosing personal information from motor vehicle records of the Class; and

    c. Whether Plaintiff and the Class Members are entitled to damages as a result of PRRS's wrongful conduct.

  38. Questions of law and fact common to the Colorado Subclass exist and predominate over any questions affecting only individual Florida Subclass Members. These include:

    a. Whether PRRS's claim to, and collection of, "notice fee" fines are unconscionable actions under the CCPA;

    b. Whether PRRS's claim to, and collection of, "notice fee" fines, including the statements in its form Notice, are a false, misleading, or a deceptive act of practice under the CCPA; and

    c. Whether the collection, and attempted collection, of the "notice fee" fines by PRRS was committed intentionally.

  39. <u>Typicality,</u> Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because they received Notices from PRRS attempting to collect the "notice fee" fine, and they have paid the "notice fee" fine.

  40. <u>Policies Generally Applicable to the Class:</u> This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged here apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct toward the Classes as a whole, not on facts or law applicable only to Plaintiffs.

  41. <u>Adequacy,</u> Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of

11

interest that would be antagonistic to those of the other Members of the Classes. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Classes and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

42. <u>Superiority and Manageability,</u> Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged here; it will permit many Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

43. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be

unnecessary and duplicative of this litigation.

44. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

45. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

46. This District represents the most desirable forum for the litigation of the claims of the class as a substantial portion of the acts giving rise to the claims of the class occurred in this District and Defendant is "at home" in this District.

## CAUSES OF ACTION

### COUNT I
### Violations of the DPPA
### (On behalf of Plaintiffs and the Putative Rule 23 Class)

47. Plaintiffs and the Classes repeat and re-allege every allegation as if fully set forth herein.

48. This claim is brought by Plaintiffs on behalf of themselves and the Federal Class, against PRRS.

49. The DPPA prohibits any person, which includes organizations or entities such as PRRS, from knowingly obtaining, disclosing, or using a driver's personal information, which includes information identifying an individual including name and address, from a motor vehicle record for use not authorized under the DPPA. 18 U.S.C. § 2721.

50. PRRS uses monitoring technology to capture and collect car license plate numbers, which it uses to obtain driver information, including name and address, from the relevant state's department of motor vehicles, or from other third parties such as insurers or data aggregators, who

13

in turn receive the information from state DMVs.

51. Accordingly, PRRS's use of monitoring technology to collect driver information to send its illegal Notices violates the DPPA by knowingly obtaining drivers' personal information from a motor vehicle record for use not permitted by the DPPA.

52. PRRS collects driver information to further its own interests by sending threatening Notices carrying no legal authority in order to coerce drivers into paying exorbitant and illegal fines for minimal parking infractions.

53. PRRS's collection of driver information is not authorized or permitted under the DPPA, and PRRS knew that its collection of driver information was not permitted under the DPPA and collected the information anyway.

54. PRRS does not obtain permission or consent from drivers to collect personal information, nor does it visibly inform drivers that personal information will be collected. Drivers are not warned when they enter or exit PRRS's parking facilities that their personal information will be collected to enforce parking fines.

55. Instead, PRRS relies on customers' scanning the QR codes on signs in the parking lot, which takes the consumer to PRRS's payment website. Only then, **after driver information has already been collected** by PRRS's monitoring technology, does PRRS seek to obtain consent from drivers via its "terms and conditions" upon payment.

56. PRRS injured Plaintiff and the Class by invading their right to privacy when it unlawfully obtained Plaintiff's and the Class's personal information from the relevant state's motor vehicle database.

57. As a result of PRRS's violation of the DPPA, Plaintiffs and the Class have a right to recover actual, liquidated, and punitive damages, and well as reasonably attorneys' fees and litigation costs. 18 U.S.C. § 2724.

**COUNT II**
**Violations of the CCPA**
**(On behalf of Plaintiffs and the Putative Rule 23 Class)**

206. Plaintiffs and the Classes repeat and re-allege every allegation as if fully set forth herein.

207. This claim is brought by Plaintiffs Brant and Fritz ("Colorado Plaintiffs") on behalf of themselves and the Colorado Subclass against PRRS.

208. The CCPA allows Colorado Plaintiffs and the Colorado Subclass to bring an action against any person, including entities such as PRRS, who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce. Colo. Rev. Stat. Ann. § 6-1-105.

209. PRRS's Notices, in which it threatens fines, booting, and/or towing, further legal action, or referral to a collection agency is an intentional practice that is designed to take advantage of consumers' lack of knowledge to a grossly unfair degree.

210. PRRS's Notices constitute deceptive trade practices under the CCPA. Each mailed Notice is a separate act, and accordingly, PRRS has violated the CCPA numerous times. Additionally, PRRS's acts of actually charging and collecting the "Notice Fee" fines and any non-posted ancillary fees are additional CCPA violations.

211. Additionally, the Notice's imposition of an "Notice Fee" in excess of the actual parking fee, which is clearly a fine under another name, is confusing because a private party cannot assess fines for parking violations. The Notice falsely implies that PRRS is acting under or has sponsorship of police powers of the state.

212. PRRS issues the Notices in the ordinary course of its business. PRRS charges hourly rates for its use of its parking facilities, then charges exorbitant fines for parking infractions within the facility. In fact, based on the disproportionately excessive dollar amounts of the fines issued, the collection of these fines is the entire basis of PRRS's business model.

213. The Notices PRRS issues have a substantial impact on the public, both in Colorado and across the United States. PRRS likely manages hundreds of parking facilities, catering to several thousand individuals who need parking services each day. Each individual who enters a PRRS facility may encounter PRRS's deceptive fine-collection scheme, even if the individual chooses not to park, because PRRS scans license plates even before those who pay to park have scanned the QR code and opted to pay for PRRS's services.

214. Colorado Plaintiffs and the Colorado Subclass have suffered actual damages as a result of PRRS's deceptive Notice scheme. Each Colorado Plaintiff has paid an exorbitant and illegal fine after receiving threats of booting, towing, and fine collection.

215. PRRS knowingly and intentionally violated the CCPA. Because PRRS intentionally perpetrated its "Notice Fee" fine scheme, Colorado Plaintiffs and the Colorado Subclass are entitled to recover damages, reasonable attorneys' fees, and costs of the litigation. Col. Rev. Stat. Ann. § 6-1-113.

### COUNT III
### Violations of the ADTPA
### (On behalf of Plaintiff Montiel)

216. Plaintiffs and the Classes repeat and re-allege every allegation as if fully set forth herein.

217. This claim is brought by Plaintiff Montiel individually against PRRS.

218. The ADPTA allows any individual, such as Plaintiff Montiel, to bring an action against any person, including entities such as PRRS, who suffers an actual financial loss as a result of her reliance on an unconscionable act or practice or unfair or deceptive act or practice in the conduct of any trade or commerce. Ark. Code Ann. § 4-88-113.

219. The ADPTA prohibits the engagement in unconscionable, false, or deceptive acts or practices in business, commerce, or trade. Ark. Code Ann. § 4-88-107. The ADPTA likewise

16

prohibits the concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, suppression, or omission of that fact. Ark. Code Ann. § 4-88-108.

220. PRRS violated the ADPTA in failing to properly post its parking rates, in failing to notify those using its facilities of the risk of incurring exorbitant fines for parking infractions, and in failing to post notice of those parking infractions and their associated fines except through deliberately inconspicuous QR Code.

221. PRRS's Notices, in which it threatens fines, booting, and/or towing, further legal action, or referral to a collection agency is an intentional practice that is designed to take advantage of consumers' lack of knowledge to a grossly unfair degree. PRRS's Notices constitute unconscionable acts under the ADPTA.

222. Additionally, the Notice's imposition of an "notice fee" in excess of the actual parking fee, which is clearly a fine under another name, is confusing because a private party cannot assess fines for parking violations. The Notice falsely implies that PRRS is acting under or has sponsorship of police powers of the state.

223. Plaintiff Montiel relied on PRRS's deceptive and unconscionable act of threatening Plaintiff Montiel with debt collections and attorneys in its Notice and paid the illegal fine to forestall collections or litigation. As a result of PRRS's deceptive conduct, Plaintiff Montiel suffered an actual financial loss by paying an exorbitant fine she did not agree to pay for a minor parking infraction.

224. PRRS knowingly and intentionally violated the ADPTA and Plaintiff Montiel is entitled to recover damages, reasonable attorneys' fees, and costs of the litigation. Fla. Stat. Ann. § 501.211.

# COUNT III
### Injunctive Relief
### (On behalf of Plaintiff and the Putative Rule 23 Class)

225. Plaintiffs and the Classes repeat and re-allege every allegation as if fully set forth herein.

226. This class is brought by Plaintiffs on behalf of themselves and the Classes against PRRS.

227. Plaintiffs move for injunctive relief to prevent PRRS from perpetrating the "non-compliance" fine scheme. Plaintiffs request a declaration and permanent injunction from the Court requiring PRRS to overhaul how it collects "notice fee" fines by providing statutory disclosures and notices or eliminate the "notice fee" fine scheme altogether.

228. PRRS's actions of mailing, attempting to collect, and collecting "notice fee" fines apply generally to the Class, such that injunctive relief is appropriate. PRRS's "notice fee" fine scheme is an intentional business practice that applies to the Class. The CCPA authorizes injunctive relief on behalf of the Colorado Subclass. Col. Rev. Stat. Ann. § 6-1-113. The ADTPA authorizes injunctive relief on behalf of Plaintiff Montiel individually. Ark. Code Ann. § 4-88-113.

229. Plaintiffs and the Classes have suffered irreparable injury, including lost time and mental anguish from PRRS's illegal threats and simple monetary damages are inadequate to compensate for this injury.

230. Balancing the hardships between Plaintiffs and PRRS, a remedy in equity is warranted to prevent PRRS from continuing to illegally extract "notice fee" fines from its consumers. The public interest would not be disserved by a permanent injunction, because without this equitable relief, PRRS would be free to continue extracting illegal "notice fee" fines after this lawsuit.

231. Plaintiffs request a declaration from this Court and permanent injunctive relief to end PRRS's illegal scheme. Specifically, Plaintiffs request the following:

   a. Require PRRS to clearly post parking rates at all facilities for all times of the day;

   b. Prevent PRRS from attempting to charge, or from collecting "fines," "balances," "charges," or other monies which exceed the parking rate;

   c. Require PRRS to install any necessary facilities (e.g., kiosks) that would accept alternative methods of payment for all facilities where a QR code is the only method of payment; and

   d. Prevent PRRS from threatening to tow vehicles, boot vehicles, refer consumers to collection agencies, levy additional fines or charges, or take any other actions in violation of the ADPTA.

## **DEMAND FOR JURY TRIAL**

232. Plaintiffs hereby request a trial by jury on all issues triable by right to a jury.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, on behalf of themselves and Class Members, pray for the following relief:

   a. An order certifying this case to proceed as a class action, designating Plaintiffs as the Federal Class and Colorado Plaintiffs as the Colorado Subclass Representatives, and designating the undersigned as counsel for the Classes;

   b. A declaration and injunctive relief altering or suspending PRRS's "notice fee" fine scheme;

   c. For an award of damages, including, but not limited to, actual, statutory, exemplary and/or punitive; consequential, and nominal damages, as allowed by law in an amount to be determined;

   d. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

   e. For prejudgment interest on all amounts awarded; and

   f. Any other relief that this Court may deem just and proper.

Date: 08/14/2025,                                            Respectfully submitted,

**SANFORD LAW FIRM, PLLC**

Josh Sanford
Col. Bar No. 44358
josh@sanfordlawfirm.com
Kirkpatrick Plaza
10800 Financial Centre Pkwy, Suite 510
Little Rock, Arkansas 72211
Phone: (501) 221-0088
Fax: (888) 787-2040