IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| BRIAN BRANT, BROOKE FRITZ, ROBERT CALDWELL, and MAYENSSI MONTIEL, Each Individually and on Behalf of All Others Similarly Situated;<br><br>Plaintiffs,<br><br>v.<br><br>PARKING REVENUE RECOVERY SERVICES, INC., a Colorado Corporation,<br><br>Defendant. | Case No.: 1:25-cv-1771-GPG-NRN<br><br>**RESPONSE TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>**JURY TRIAL DEMANDED** |

**RESPONSE TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**

**I.      INTRODUCTION**

Plaintiffs cannot be compelled to arbitration because they formed no agreement with Defendant to arbitrate. The signs at the parking facilities where Plaintiffs parked and received their illegal notices of noncompliance are insufficient to create a contract because they fail to notify individuals parking in the lots of the arbitration terms. But even if the signage at the lots is technically sufficient, they are so poorly designed and one-sided as to be unconscionable and unenforceable.

**II.      LEGAL STANDARD**

While arbitration agreements are governed by the Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq., "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Ramirez v. Domino's Pizza Supply Chain*, No. 24-CV-01731-SKC-STV, 2024 WL 5452684, at *2 (D. Colo. Nov. 8, 2024), *adopted at* No. 24-CV-01731-SKC-STV, 2025 WL 414381 (D. Colo. Feb. 6, 2025). This preliminary question of whether

1

the parties agreed to arbitrate "must always be decided by a court," using "ordinary principles governing contract formation." *Munoz v. Conduent State & Loc. Sols., Inc.*, No. 24-2044, 2025 WL 799482, at *5-6 (10th Cir. Mar. 13, 2025) (quoting *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105 (10th Cir. 2020)). Only after determining whether a valid agreement to arbitrate exists may a Court consider whether the parties' dispute falls under the agreement. *Id*.

While the FAA harbors a "liberal policy favoring arbitration agreements," courts are not permitted to favor arbitration over litigation but must treat arbitration agreements "as enforceable as other contracts, but not more so." *Brock v. Flowers Foods, Inc.*, 121 F.4th 753, 760 (10th Cir. 2024) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022)). When analyzing a motion to compel arbitration, courts in this Circuit apply "a standard similar to that governing motions for summary judgment." *Stein v. Burt-Kuni One, LLC*, 396 F. Supp. 2d 1211, 1213 (D. Colo. 2005). The party seeking enforcement of the arbitration provision "must present evidence sufficient to demonstrate an enforceable arbitration agreement." *Id*. Then the burden shifts to the opposing party "to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." *Id*.

### III.   ARGUMENT

The Court cannot compel arbitration in this case because no agreement to arbitrate existed. It is axiomatic that parties to a contract must know the terms to which they are agreeing prior to acceptance and contract formation, but Defendant's signage at the Little Rock and Denver parking lots where Plaintiffs parked is so inconspicuously and poorly placed that nobody entering the facilities could possibly be put on notice as to its terms. Regardless, even if this Court determines that Plaintiffs were on notice as to the arbitration terms, the agreement is unconscionable and

2

cannot be enforced. Accordingly, Defendant has failed to demonstrate the existence of an enforceable agreement to arbitrate and its Motion to Compel must be denied.

**A.      The parties did not form a contract because there was no mutual agreement.**

As Defendant notes in its Motion to Compel, contact law in Arkansas and Colorado run parallel, and application of either state's law would result in an identical outcome on this issue. Accordingly, the law applied is irrelevant because the result is the same: no contact exists in this case because Plaintiffs were not made aware of the terms of the contract to which they ostensibly entered.

1.      No contract is formed absent mutual agreement with notice as to the terms.

Under relevant law, courts "cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no meeting of the minds, there is no contract." *Alltel Corp. v. Sumner*, 360 Ark. 573, 576–77, 203 S.W.3d 77, 80 (2005). Further, "it is well settled that in order to make a contract there must be a meeting of the minds as to all terms, using objective indicators," and "[b]oth parties must manifest assent to the particular terms of the contract." *Id.* (citing *Williamson v. Sanofi Winthrop Pharm., Inc.,* 347 Ark. 89, 60 S.W.3d 428 (2001); *Van Camp v. Van Camp,* 333 Ark. 320, 969 S.W.2d 184 (1998)). In examining whether a party has assented to an agreement's terms, "'the threshold issue' is whether the consumer had 'reasonable notice, either actual or constructive, of the terms of the putative agreement' and whether the 'consumer manifest[ed] assent to those terms.'" *In re HomeAdvisor, Inc. Litig.*, No. 16-CV-01849-PAB-KLM, 2019 WL 4463890, at *3 (D. Colo. Sept. 17, 2019) (quoting *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012)).

"When a party is unaware of a term of a contract because it was hidden or obscured, there can be no presumption that there was a meeting of the minds as to such term." *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1026 (D. Colo. 2012); *see also Erwin-Keith, Inc. v. Stewart*, 2018

3

Ark. App. 147, 9–10, 546 S.W.3d 508, 513 (2018) ("For a party to assent to a contract, the terms of the contract, including an arbitration agreement, must be effectively communicated."). Thus, this Court may only enforce the arbitration terms if those terms were "reasonably conspicuous," and Plaintiff's alleged assent was "unambiguous." *Grosvenor*, 854 F. Supp. 2d at 1026 (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002)).

    2.    <u>Plaintiffs had no notice of the arbitration terms and there was no mutual agreement.</u>

Defendant claims that Plaintiffs received notice via "signs" placed at the entrances and exits to the 400 East 3rd Street parking garage ("East 3rd Street garage"), the 1401 Market Street parking lot ("Market Street lot"), the 1385 Larimer Street parking lot ("Larimer Street lot"), and the 3350 Brighton Boulevard parking lot ("Brighton Boulevard lot") where Plaintiffs Montiel, Fritz, Brant, and Caldwell parked, respectively, and received their illegal Notices of Noncompliance from Defendant. The signs that purportedly bind Plaintiffs to Defendant's arbitration terms are too inconspicuously placed to put any driver entering the facilities on notice that he or she is waiving the right to a trial by jury by parking within.

    *i.*    *The signs at the East 3rd Street garage are inadequate to create a contract.*

On April 26, 2025, when Plaintiff Montiel parked at the East 3rd Street garage, the facility contained 45 signs. Decl. of Mayenssi Montiel ("Decl. Montiel") ¶ 10–11, attached as Ex. 1. Of those 45 signs, 44 signs provide payment instructions and a QR code that launch Defendant's payment portal when scanned. *Id.* at ¶ 11. The "Pay at this Sign" signs do not contain any notice of additional terms and conditions. *See* Payment Sign, attached as Ex. 2; Decl. Montiel ¶ 7. Moreover, the payment portal itself does not contain any notice of additional terms and conditions. *See* Payment Portal, attached as Ex. 3; Decl. Montiel ¶ 7. When paying through the portal, Plaintiff was not required to click a checkbox acknowledging terms and conditions, nor did the portal

4

contain any pop-up notification or conspicuous notice that arbitration terms applied. Decl. Montiel ¶ 7.

The East 3rd Street garage contains exactly one sign[1] providing notice or arbitration terms, and as shown in Exhibit 2 to Defendant's Motion to Compel (ECF No. 28-3), the positioning of that sign is woefully inadequate to place drivers on notice of the arbitration terms. Rather than being prominently placed in a driver's direct line of sight, the sign faces the side of vehicles entering or exiting the facility. *See* Ex. 2 to Def.'s Mot. to Compel, ECF No. 28-3; Decl. Montiel ¶ 12. The bottom of the sign appears to sit four or five feet off the ground, meaning the bottom of the sign is a foot or two above the head of a driver seated in a low-clearance sedan such as the vehicle Plaintiff Montiel was driving on April 26 when she entered the facility. Decl. Montiel ¶ 13.

Defendant has put no mechanism in place by which it can ensure drivers entering the East 3rd Street garage have actual or inferred notice of the arbitration terms. There is no barrier to entry such as a gate, nor is there any indication that drivers should slow down to read a sign such as a stop sign or a speed bump. Decl. Montiel ¶ 5. The sign is not only positioned such that it is not easily seen from the driver's seat of a vehicle, it is on a post so close to the street that cars pausing to read the terms or scan the QR codes will sit unsafely halfway in the street. *Id*. at ¶ 12. This is a particular issue when there is a line of cars entering the facility; drivers do not want to stop to check above their heads for a terms and conditions sign when they may cause an accident on the street behind them by stopping in the entryway. *See id*. at ¶ 6. The QR codes at the bottom of the

---

[1] Defendant repeatedly refers to the "signs," plural, throughout the East 3rd Street garage. Assumedly, Defendant is referring to the fact that the same sign is posted on the front and back of the signpost, as shown in Ex. 3 to Defendant's Motion to Compel, ECF No. 28-4. Even generously assuming that posting the same sign on both sides of a signpost qualifies as more than one sign, this "second" sign is inadequate to bind anyone who parks in the East 3rd Street garage because it is positioned such that only cars exiting the facility could reasonably be expected to see it. A sign cannot retroactively bind an individual to an agreement after he or she has already performed the action that purportedly creates the contract.

5

sign do not provide access to the payment portal; they launch static websites that contain nothing but Defendant's terms and conditions. *Id.* at ¶ 14. Thus, Defendant has no way of knowing whether drivers entering the East 3rd Street garage stop to read their terms or scan the QR codes to access the online terms and conditions and cannot ensure that all drivers are aware that they are purportedly agreeing to waive their right to a jury trial by parking within, and Defendant may not enforce an arbitration term against a party who cannot be charged with knowledge of the term. *See, e.g.*, *Shockley v. PrimeLending*, 929 F.3d 1012, 1019 (8th Cir. 2019).

        ii.        The signs at the Market Street lot are inadequate to create a contract.

Plaintiffs Brant and Fritz both received illegal Notices of Noncompliance for parking at Defendant's Market Street lot. Plaintiff Fritz received hers in 2023 and Plaintiff Brant received his in May of 2025. The signage at the Market Street lot has changed over the years; Defendant's Exhibits 4 and 6 provide photos of the signs as they were at the times that Plaintiffs Fritz and Brant parked at the Market Street lot, respectively. In both 2023 and 2025, Defendant placed red arbitration signs at both entrances to the lot. *See* ECF No. 28-5, 28-7. The only difference in the signs between the 2023 and 2025 is that at some point Defendant replaced the horizontal signs with vertical signs and moved the signs down the pole to be positioned closer to the ground. *Id*. In 2025, Defendant placed one additional red sign on a pole facing the lot and backing up to 14th Street. *See* ECF No. 28-7, p. 7. As with the East 3rd Street garage, the signs at the Market Street lot are inadequate to put Plaintiffs on notice that they are waiving their right to a trial by jury simply by parking within.

The Market Street lot is situated on a corner with entrances off both of its bordering streets. Decl. of Brian Brant ("Decl. Brant") ¶ 4, attached as Ex. 4. Both of the bordering streets, Market Street and 14th Street, are one-way streets, which means that cars may only enter the lot by turning

6

left into the lot from either 14th Street or Market Street. *Id*. at ¶ 10. Both in 2023 when Plaintiff Fritz parked in the Market Street lot and in 2025 when Plaintiff Brant parked in the Market Street lot, the signs at the entrances to the lot were positioned such that, because the bordering streets are one-way, the signs are behind the left shoulder of vehicles entering the lot regardless of which entrance is used.[2] *See* ECF Nos. 28-5, 28-7. In 2025, the lower positioning of the sign causes the sign to fall below a vehicle's window clearance such that even if drivers look back over their shoulder, they would not see the sign because it is blocked by the car door. Decl. Brant ¶ 6. The sign at the Market Street entrance is further blocked by a large "pay here" sign with an awning. *See* ECF Nos. 28-5, 28-7. In 2023, the Market Street entrance sign was further blocked from vehicles entering the lot by a credit card payment machine, which projected outward between the vehicles entering and the sign. *See* ECF No. 28-5, p. 3. This machine was removed prior to Plaintiff Brant's parking in 2025, but the red sign is still on the far side of the blue "pay here" sign under a large blue awning. ECF No. 28-7, p. 2.

      The additional sign added in 2025 is posted on a pole that borders 14th street and an entire bank of parking spots separates individuals parking in the lot from the sign. *See* ECF No. 28-7, p. 7. The sign is posted high above the ground, presumably so that it can be seen over the roofs of the cars that park in front of it, but the print is so small, and the sign is so poorly lit, that individuals would have to walk between the cars and possibly climb onto the hood of the car directly in front of the sign in order to read it. Decl. Brant ¶ 12. Even Defendant's photographer was unable to get a clear picture of the language on the sign when presumably standing right below it. *See* ECF No. 28-7, p. 8.

---

[2]    Incidentally, this is also true of vehicles exiting the lot. Regardless of which exit a car uses, it would be required to turn left out of the lot, which would place the arbitration signs behind the driver's right shoulder as he or she turned and would never be in a direct line of sight.

7

Like the East 3rd Street garage, the Market Street lot does not have barriers, stop signs, speed bumps or other mechanisms that would require a vehicle to slow down or pause while entering. Decl. Brant ¶ 5. In 2025,[3] the 14th Street entrance to the lot has a prominent yellow sign posted stating that the lot does not accept cash and the only means of paying is by QR code. *See* ECF No. 28-7, p. 6. This sign is posted on the right side of the entrance, directly facing the cars that would be turning left as they pull into the lot. *Id*. Accordingly, this bright yellow sign with large lettering and a stop sign that provides payment information is positioned specifically to catch a driver's eye as he or she enters the lot while the red arbitration sign with tiny lettering is positioned such that nobody entering the lot would see it unless he or she was specifically looking for it. *Id*.

The Market Street lot again contains "pay here" signs with QR codes that take individuals to Defendant's payment portal. Decl. Brant ¶ 9. Like the portal at the East 3rd Street garage, this portal does not contain arbitration terms, either by prominent placement or click or check box. *Id*. ¶ 7. Notably, the QR code signs were placed nowhere near the signs containing arbitration terms. *Id*. at ¶ 8. In fact, the QR code signs are on the opposite side of the lot as the arbitration terms sign. *See* ECF No. 28-7, p. 6. Thus, individuals paying by QR code would have their backs to the arbitration sign and would have no reason to turn around and look for additional signs after paying. *See* Decl. Brant ¶ 8–9, 12. Like with the East 3rd Street garage, Defendant's arbitration signs at the Market Street lot are designed to be missed by individuals actually using the lot.

---

[3] This might be true of the lot in 2023, but the photos of the Market Street lot in 2023 in Defendant's exhibits do not show the entire 14th Street entrance to the lot. *See* ECF No. 28-5, p. 4.

8

*iii.   The signs at the Larimer Street lot are inadequate to create a contract.*

Just like with the East 3rd Street garage and the Market Street lot, the signs Defendant seeks to enforce at the Larimer Street lot were inadequate to put Plaintiff Fritz on notice that she was waiving her right to a jury simply by parking within.

Critically, the most prominent signs containing arbitration terms posted at the Larimer Street lot face vehicles as they exit the lot, see ECF No. 28-6, p. 2, which is insufficient to create a contract because exit signs cannot retroactively create a contract by imposing obligations on individuals who have already performed the act that purportedly creating the contract prior to knowing the terms. The only sign in the Larimer lot that contains arbitration terms that drivers entering the lot would arguably be expected to see is posted on a pole situated on the passenger side of vehicles entering the lot. *See* ECF No. 28-6, p. 5. It is not in a driver's direct line of sight, and the lettering is so ridiculously tiny that nobody sitting in the driver's seat of a vehicle could reasonably be expected to read it. *See id*.

*iv.   The signs at the Laz Parking lot are inadequate to create a contract.*

Again, the signs at the Laz Parking lot are insufficient to put individuals on notice that they are agreeing to arbitration terms. According to Defendant's evidence, the Laz Parking lot contains two signs stating arbitration terms. ECF No. 28-8. One sign faces vehicles as they exit the lot, which as stated above cannot retroactively create a contract. The other sign is posted in a far corner of the lot, not in an area calculated for individuals to see it prior to parking. Decl. of Robert Caldwell ("Decl. Caldwell") ¶ 6, attached as Exhibit 5. Like with the other lots at issue in this lawsuit, the Laz Parking lot does not have a barrier to entry, but unlike the other lots, the Laz Parking lot does not have an arbitration terms sign even arguably facing vehicles as they enter the lot. *See generally*, ECF No. 28-8, Decl. Caldwell ¶ 4, 5. Again, neither of the arbitration terms

9

signs are posted near a "pay here" QR code sign such that Defendant could assert that individuals paying by QR would be guaranteed to see the arbitration terms. Rather, the signs are posted well away from the QR codes and are high above the ground so that any individual paying through QR code would miss the sign because he or she would walk under it while looking down at his or her phone while making payment. Decl. Caldwell ¶ 6. The tiny red stickers posted under the red signs do not cure this defect. The signs are illegible, even from Defendant's photo closeup. *See* ECF No. 28-8, p. 6; Decl. Caldwell ¶ 7.

> v.   *The signs at the Laz Parking lot are inadequate to create a contract.*

Based on the above review of the four parking facilities at issue in this case, a pattern emerges that highlights and underscores Defendant's predatory practices. The signs Defendant posts that contain arbitration terms are poorly lit and generally illegible. The signs are positioned such that they would never be in a driver's direct line of sight when entering the facility. Rather, the signs are posted such that they are just out of a driver's line of sight, meaning that Defendant can plausibly argue that they signs are prominently placed but any individual actually using the parking facility is likely to miss them. This is particularly evident where Defendant has posted signs that *are* reasonably calculated to catch a driver's eye as he or she enters the facility. In both the East 3rd Street garage and the Market Street lot, Defendant has posted signs containing important payment information such that any individual entering the lot is practically guaranteed to see the sign, but they placed the sign containing arbitration terms just out of those individual's line of sight. Decl. Montiel ¶ 4–5; Decl. Brant ¶ 4–5. *See also*, ECF Nos. 28-3, 28-4, 28-7.

Moreover, Defendant does not place the arbitration terms signs near any of the QR code signs that individuals are required to use to pay to park. Not one of the arbitration terms signs in Defendant's evidence is posted next to or even close to a "pay here" QR code sign. In the East 3rd Street garage, the QR code signs grossly outnumber the arbitration terms signs. Decl. Montiel ¶ 9.

In the Market Street lot, the arbitration terms signs are posted aside signs stating that payment must be made by QR code, but the QR code itself is nowhere to be found. *See* ECF No. 28-7; Decl. Brant ¶ 12. In fact, the QR codes are located across the parking lot such that anybody who scanned the QR code would have his or her back to the terms and conditions signs when scanning and making payment. Thus, Defendant cannot argue that individuals must have seen the arbitration terms by scanning a QR code sign because Defendant positions the QR codes, which individuals must use to pay, deliberately away from the arbitration terms signs. Moreover, the payment portal itself does not make the arbitration terms clear and prominent. Plaintiffs did not have to click a box acknowledging terms and conditions, nor were there any notices that additional terms and conditions applied. Decl. Montiel ¶ 7; Decl. Brant ¶ 7; Decl. Caldwell ¶ 9.

Defendant does not use other mechanisms to ensure individuals see the arbitration terms. The lots universally have no barriers to entry. No Plaintiff in this lawsuit was required to stop and acknowledge the terms of parking prior to entering the lot. Defendant does not have notices or stop signs directing drivers to the terms and conditions signs nor are there speed bumps or barriers to entry that would cause drivers to pause or even slow down before pulling in and finding a parking spot. Moreover, the signs are universally difficult to read. The white lettering on the red background is hard on the eyes, and the lettering itself is tiny to the point of illegibility. *See* ECF Nos. 28-3, p. 2; 28-5, p. 3–4; 28-6, p. 5; 28-7, p. 8; 28-8, p. 3. Defendant obviously knows how to make a sign legible because its payment information signs are clear and easy to read. *See* Ex.2; ECF No. 28-7, p. 4, 6.

This pattern of obfuscation can only be deliberate. Defendant relies on the unwary individual parking in its facilities to overstay his or her payment so that it can impose exorbitant, unreasonable, and illegal fines, and then if an individual seeks redress for this extortion, Defendant

11

can claim he or she "agreed" to arbitration terms by driving past a poorly placed, unlit, illegible sign.

Defendant cannot enforce arbitration on such bare and one-sided notice that the terms exist. Defendant likens this case to other lawsuits in which it has defended its predatory practices and was able to compel the plaintiffs to arbitration, but Defendant was apparently more meticulous in its sign placement at the facilities at issue in those cases. In *Tobey v. Ace Parking Management*, the Northern District of Texas specifically noted that Defendant's parking garage "ha[d] **several signs dotting the lot** informing those who see them that 'This is a Contract' and that 'By parking on this Facility, you accept all these terms.'" No. 3:24-CV-2932-X, 2025 WL 1919887, at *1 (N.D. Tex. July 11, 2025) (emphasis added). Later, the court specifically addressed the conspicuousness of the terms and noted that the plaintiff had paid for parking at a kiosk on which was a prominent red sticker notifying him of the arbitration terms. *Id*. at *2–3. Unlike here, the plaintiff in *Tobey* was required to stop and pay before entering the facility and was directly confronted with a conspicuously placed sticker containing arbitration terms prior to entering the facility. *Id*. Moreover, just in case the *Tobey* plaintiff missed it on entering, the facility contained several other signs stating the terms spread throughout, whereas the facilities at issue in this case only contain a few, poorly placed, and illegible signs. *Id*. at *1.

This is equally true of Defendant's reliance on *Butler v. Asura Technologies USA, Inc.*, No. 1:24-cv-529 (D. Col.). While the *Butler* court did not specifically examine the conspicuousness of the signs in the manner of the *Tobey* court, it did note that the facility at issue had "**large** red signs at the entrance to the parking lots" and "the red signs were posted conspicuously **throughout the lots** where Plaintiffs parked." Order, *Butler*, No. 1:24-cv-529 (D. Col. Oct. 7, 2024), ECF No. 33 at p. 5 (emphasis added). Again, here the single sign containing arbitration terms is small and elevated to a height to make it difficult to read.

12

Plaintiffs neither saw nor read the poorly placed signs at the facilities in which they parked. Decl. Montiel ¶ 5, 16; Decl. Brant ¶ 6, 9; Decl. Caldwell ¶ 5. As stated above, the positioning of the signs was such that it was either behind or off to the side of Plaintiffs as they entered the lots. The signs were likewise positioned such that Plaintiffs' vehicles, either the roof or the door, blocked their view of the signs as they drove past. Moreover, most Plaintiffs entered the facilities in the evening or as it was getting dark, and not one of the terms and conditions signs in Defendant's lots are lit. Plaintiffs were never put on notice that by parking at Defendant's parking lots they were waiving their right to a trial by jury. Because there was no mutual agreement as to this term, there is no contract to enforce.

B.    **If an agreement was made, it is unconscionable and unenforceable.**

Should the Court determine that the signs shown in the Exhibits to Defendant's Motion to Compel were sufficient to notify Plaintiffs of the arbitration terms and they manifested their assent to those terms by parking in the facilities, it should still decline to compel arbitration because the terms are unconscionable. Plaintiffs specifically challenge not only the arbitration requirement itself, but also independently challenge the delegation clause of the arbitration section within the terms and conditions, which does not even appear on the red sign that Defendant claims puts drivers on notice of the arbitration terms.[4] The delegation clause is only accessible by scanning the QR code on the red entrance sign, which is only visible to drivers who happen to be looking in the right direction and can safely pause long enough to scan the code without blocking oncoming traffic. The Court should decline to enforce the unconscionable delegation clause and determine the arbitration terms as a whole are unconscionable and unenforceable.

---

[4]    The full terms and conditions can be found at https://prrsparking.com/termsandcond.html (last visited July 25, 2025).

13

1. <u>Courts examine both procedural and substantive unconscionability in assessing the enforceability of arbitration terms.</u>

In analyzing the unconscionability of arbitration agreements, courts examine two categories: (1) procedural, and (2) substantive unconscionability. *Enderlin v. XM Satellite Radio Holdings, Inc.*, No. 4:06-CV-0032 GTE, 2008 WL 830262, at *13 (E.D. Ark. Mar. 25, 2008) (citing *Davidson v. Cingular Wireless LLC*, No. 2:06CV00133-WRW, 2007 WL 896349 (E.D. Ark. Mar. 23, 2007)); *see also Nesbitt v. FCNH, Inc.*, 74 F. Supp. 3d 1366, 1371 (D. Colo. 2014). "[A] contract to arbitrate is unenforceable under the doctrine of unconscionability when there is both a procedural and substantive element of unconscionability, but procedural and substantive unconscionability need not be present in the same degree." *Enderlin*, 2008 WL 830262, at *13 (quoting *Circuit City Stores, Inc. v. Mantor,* 335 F.3d 1101, 1105–06 (9th Cir. 2003)) (internal quotations omitted). "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id*. (quoting *Mantor*, 335 F.3d at 1106).

Courts use a number of factors to determine the unconscionability of a contract:

> (1) the use of a standardized agreement executed by parties of unequal bargaining power; (2) the lack of an opportunity for the customer to read or become familiar with the document before signing it; (3) the use of fine print in the portion of the contract containing the provision in question; (4) the absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; (5) the terms of the contract, including substantive fairness; (6) the relationship of the parties, including factors of assent, unfair surprise, and notice; and (7) the circumstances surrounding the formation of the contract, including setting, purpose, and effect.

*Nesbitt*, 74 F. Supp. 3d at 1371 (quoting *Bernal v. Burnett*, 793 F. Supp. 2d 1280, 1286 (D. Colo. 2011)). Courts should "review the totality of the circumstances surrounding the negotiation and execution" in assessing whether a contractual provision is unconscionable, and "[t]wo important

14

considerations are whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question." *Enderlin*, 2008 WL 830262, at *11 (quoting *Casteel v. Clear Channel Broadcasting, Inc.,* 254 F.Supp.2d 1081, 1089 (W.D. Ark. 2003)).

"Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Enderlin*, 2008 WL 830262, at *11 (quoting *Kinkle v. Cingular Wireless LLC,* 857 N.E.2d 250, 254 (Ill. 2006)). "Courts look to the circumstances surrounding the transaction including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Id.* (citing *Davidson,* 2007 WL 896349, at *5); *see also Nesbitt*, 74 F. Supp. 3d at 1371.

"Substantive unconscionability looks to the actual terms of the contract to see if they are one-sided." *Enderlin*, 2008 WL 830262, at *13 (quoting *Davidson,* 2007 WL 896349, at *5). Substantive unconscionability also "concerns the terms of the agreement and whether those terms are so one-sided as to shock the conscience." *Id*. (quoting *Mantor,* 335 F.3d at 1107). A plaintiff may demonstrate substantive unconscionability "where there is an 'absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated' or where the terms of the contract suggest a lack of 'substantive fairness.'" *Vernon*, 857 F. Supp. 2d at 1157 (quoting *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986)).

2.  <u>The arbitration terms are procedurally unconscionable.</u>

As described above, the sign that purported to notify Plaintiffs of the arbitration terms were so poorly constructed as to be unconscionable. Rather than positioning the signs so that drivers can reasonably be expected to see them as they approach the parking facilities, the signs universally

15

Case No. 1:25-cv-01771-GPG-NRN   Document 30   filed 10/08/25   USDC Colorado
pg 16 of 19

sit either behind or above the heads of drivers entering the lots, and are so close to the street that drivers could not safely pause to read the terms.

Recent decades are rife with litigation concerning the various manners in which defendants attempt to bury their arbitration terms as a trap for the unwary, but courts have consistently held that plaintiffs cannot be compelled to arbitration when the arbitration terms are so inconspicuously placed that they are insufficient to notify the recipient of the contractual nature of the notice. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) ("an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious").

Defendant cannot enforce arbitration terms that it deliberately obscures by placing them on illegible signs that cannot be seen or read from the vantage point at which viewers would be expected to see them. The sign is purported to bind individuals parking at Defendant's lots, all of whom will be driving into the facility, but the signs are hung such that they cannot be easily seen from inside a car. Decl. Montiel ¶ 12–13; Decl. Brant ¶ 11; Decl. Caldwell ¶ 6; *see also* ECF No. 28-6, p. 5. Moreover, the QR code on the signs that bring the viewer to Defendant's full terms and conditions are not safely scannable from the driver's seat of a vehicle entering the facility. Decl. Montiel ¶ 12; Decl. Brant ¶ 5. The full terms and conditions are not otherwise available on any payment signs posted in Defendant's parking lots, nor are they provided by scanning the QR code that takes individuals to the payment portal. Decl. Montiel ¶ 7, 9–10; Decl. Brant ¶ 7. Accordingly, the full terms and conditions, which includes the delegation clause contained within the arbitration terms that delegates questions of arbitrability to the arbitrator, are designed to be inaccessible to those whom they purport to bind.

The other factors courts use in weighing procedural unconscionability likewise fall in Plaintiffs' favor. The sign is clearly standardized and presented to potential parkers on a take-it or

16

leave-it basis, and those hoping to use the parking facilities provided by Defendant are certainly unable to bargain for better terms in the moment of needing a place to park. As stated above, the sign is not posted in a manner that lends itself to being read thoroughly before parking because it is posted above the heads or behind the shoulders of those entering the facility in a position that makes it unsafe to pause to thoroughly read the terms before entering. The signs are procedurally inadequate to notify individuals of the arbitration terms and any resulting contract is unconscionable and unenforceable.

      3.      <u>The arbitration terms are substantively unconscionable.</u>

The arbitration terms are so unreasonable, one-sided, and heavily favorable to Defendant that they are substantively unconscionable. As outlined in Plaintiffs' Amended Complaint, Defendant's business model relies on obfuscation and unclarity in hopes that it can turn minor parking infractions into high-dollar, illegal fines. On information and belief, most of Defendant's profit margin is predicated on extracting these fines rather than low-dollar hourly parking rates. To accomplish this goal and raise profits, Defendant removes all barriers for entry to its parking garages and makes the only mechanism for payment a QR code scan. While these "pay here" QR code signs are hung throughout Defendant's parking facilities, the only signs that warn individuals that they are waiving their right to a trial by jury are generally placed remotely in a manner not calculated to be seen by vehicles entering the facilities.

Defendant provides no grace period or warning for parking infractions; vehicles that remain mere minutes past their last hourly payment are slapped with exorbitant fines. *See* Am. Compl. ¶ 21, ECF No. 19. Moreover, Defendant's "cutting-edge" scan-and-pay portal does not provide notice that parking time is nearly expired, and when individuals pay for additional time before the original payment is completely expired, Defendant fails to account for the minutes of time that were not used up on the original payment. For example, on April 26 Plaintiff Montiel

17

paid for two hours of parking time, from 8:01 pm to 12:01 am. Am. Compl. ¶ 26. At 11:57, four minutes prior to the time her parking expired, Plaintiff Montiel paid for an additional two hours, ending in 1:57 am. *Id*. Plaintiff Montiel exited the garage at 2:01 am, which is exactly four hours after she entered the garage, but still received a fine for overstaying even though she paid for four hours of parking. *Id*.

Defendant continues these predatory and unconscionable business practices by seeking to force individuals who object to these practices into costly arbitration in which they cannot mitigate their costs through collective action. To the extent that Defendant may argue that mandated arbitration is standard practice for parking services, it is worth noting that these types of scan-and-pay parking garages are a relatively recent development and much of the case law surrounding the practice has been developed in lawsuits against Defendant and other, similarly predatory businesses. It is only standard practice in the industry because Defendant itself made it so, and there was no other reason for any individual parking in a parking garage to believe he or she was waiving the right to a trial by jury simply by parking within, particularly with so little notice of the terms as described above.

Accordingly, the arbitration terms, including the delegation clause, contained within Defendant's terms and conditions are both procedurally and substantively unconscionable. The Court should determine the delegation clause invalid and decline to compel arbitration.

### III.   CONCLUSION

The Court cannot compel arbitration in this case because Plaintiffs did not agree to be bound by the terms. Defendant failed to put individuals entering its parking facilities on notice of the arbitration terms because the posted signs containing those terms are poorly placed and illegible from the vantage point from which potential parkers would be expected to view it. Regardless, the arbitration terms itself, including the delegation clause, are procedurally and

18

substantively unconscionable and cannot be enforced. Defendant's Motion to Compel must be denied.

Date: 10/08/2025,              Respectfully submitted,

                         **SANFORD LAW FIRM, PLLC**

                         Josh Sanford
                         Col. Bar No. 44358
                         josh@sanfordlawfirm.com
                         Kirkpatrick Plaza
                         10800 Financial Centre Pkwy, Suite 510
                         Little Rock, Arkansas 72211
                         Phone: (501) 221-0088
                         Fax: (888) 787-2040